_____ FILED    ✓ ENTERED
_____ LODGED   _____ RECEIVED

SEP _ 1 2011

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____ DEPUTY

**Attachment A**

**Stipulated Statement of Facts**

A. **The Law Office of Stanley Needleman**

The Defendant, Stanley Needleman, has practiced law as a licensed attorney in the State of Maryland for more than thirty years. His legal practice, which is located at 1005 North Calvert Street in Baltimore City, Maryland, concentrates on the area of criminal defense in both state and federal court.

The legal fees the Defendant charged depended upon the seriousness of the criminal charges filed against his clients and whether those charges were being prosecuted in state or federal court. For example, to represent a client for a traffic citation or misdemeanor offense filed in the District Court of Maryland, the Defendant might charge $750, whereas a client facing felony drug charges in federal court would pay between $10,000 and $30,000 or more. The Defendant did not use an advance fee retainer agreement; rather, he charged a one-time engagement fee to represent the client whether the case was ultimately dismissed, the client pled guilty, or the matter went to trial. Payment in full was usually due before the Defendant entered his appearance in court, although sometimes he allowed his clients to pay in installments.

A client who hired the Defendant would mail or deliver his payment to the Law Office of Stanley Needleman at 1005 North Calvert Street. Payments were made by cash or check, with cash being the most common form of payment. An assistant in the office would fill out a receipt, give one copy to the client and attach a second copy to the cash or check payment. A third copy was maintained in the receipt book. All payments and related receipts for a given day were kept in a large bank envelope in a drawer in the front office.

If a client paid the Defendant directly, such as when they met in court or in the Defendant's office, the Defendant would sometimes ask the office assistant to give the client a receipt. The fees collected by the Defendant were not always placed in the bank envelope at the front desk.

At the close of each business day, the Defendant took the bank envelope with the day's receipts home with him. There was no bookkeeper or accountant to enter the day's receipts into a business ledger, and none of the office assistants tallied the receipts or completed bank deposit

slips. The next business day, the Defendant would return the bank envelope to the drawer empty.

B.   **Tax Evasion**

Federal agents undertook a review of the Defendant's tax returns filed for years 2005-09. Attached to each of the Defendant's tax returns, which were filed jointly with his wife, was a IRS Schedule C titled "Profit and Loss From Business" that reported the Defendant's annual gross income and expenses for his law practice. The agents also reviewed the law practice's bank account at Wachovia Bank and the Needlemans' joint personal account, also at Wachovia Bank. A comparison of the amount of gross business income reported on his Schedule C with the total amount of deposits made into the business and personal banks accounts revealed that the two amounts were almost the same. In other words, the business receipts that were deposited into the bank accounts were essentially the only monies reported as income by the Defendant on his tax returns.

Federal agents reviewed the number and types of federal and state cases in which the Defendant had entered his appearance as the attorney of record for the years 2006 to 2010 and estimated that the amount of legal fees he collected for those cases was significantly more than what he had deposited into his bank account. Consequently, the estimated amount of fees charged was also significantly more than what he reported as gross income on his tax returns. Federal agents also interviewed some of the Defendant's prior clients about the fees they had been charged. Some of them said they had paid more than what the agents were able to identify as the deposit of their legal fees into the law firm's bank account.

On April 14, 2011, federal agents executed search warrants at the Defendant's law office on Calvert Street and his residence located at 3418 Englemeade Road, Pikesville, Maryland. In the basement of his residence, agents found two safes that contained a large amount of cash, some of which was packaged in bags and loose bundles totaling $1,153,660. The agents also found business ledgers that chronicled the legal fees paid by hundreds of the Defendant's prior clients for the period of 2005 to 2010. All the entries were in the Defendant's handwriting and they listed the approximate dates of the payments and whether they were made by cash or check. According to former employees of the law firm, the Defendant carried the ledgers with him at all times and he was the only one they saw who made entries in it.

A review of the ledgers revealed that the majority of the legal fees were paid in cash and a significant amount of that cash was not being deposited into the Defendant's business and personal bank accounts. The following table sets forth the difference between the amount of legal fees paid to the law firm as recorded in the ledgers and the amount of money actually deposited into the Defendant's bank accounts, with the difference representing the yearly amount of undeposited cash.

|  | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Gross Receipts per Ledgers | $822,182.00 | $861,148.00 | $832,945.00 | $802,662.00 |
| Total Bank Deposits | $530,284.46 | $525,674.92 | $492,614.24 | $475,128.70 |
| **Undeposited Cash** | $291,897.54 | $335,473.08 | $340,330.76 | $327,533.30 |

As noted above, the Defendant used the bank deposit method to report the law firm's gross income on Schedule C. By not depositing significant amounts of cash received from his clients and hoarding it in his basement, the hoarded cash was not reflected on the Defendant's bank statements and, thus, was intentionally and willfully omitted from the gross amount of income he declared to the Internal Revenue Service on Schedule C.

The following table summarizes the amount of unreported income for the years 2005 through 2009 and the amount of additional tax due and owing as a result of the under-reporting.

|  | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Ledger Total | $702,136 | $817,373 | $857,918 | $758,407 | $819,870 |
| Gross receipts Reported on Return | $489,218 | $473,524 | $490,045 | $495,536 | $490,074 |
| **Unreported Income** | $212,980 | $343,849 | $367,873 | $262,871 | $329,796 |
| **Addt'l Fed. Tax due** | $80,179 | $126,638 | $134,330 | $88,167 | $115,381 |

**Total Unreported Income**     $1,517,369

**Total Additional Federal Tax Due**     $543,695
**Total Additional State Tax Due**     $117,319

For each of the foregoing years, the Defendant filed a Form 1040 joint tax return that he signed and falsely attested to be true, correct, and complete under the penalties of perjury.

C. **Illegal Structuring of Financial Transactions**

    a. **Preventing a Bank From Filing a Currency Transaction Report**

As an attorney and a small business owner, the Defendant knew that the Bank Secrecy Act (BSA) required banks to file a Currency Transaction Report (IRS Form 4789) for cash transactions over $10,000. The Defendant was also aware that the BSA required him to file an IRS Form 8300 to report the receipt of more than $10,000 in cash from a single client in one or more related transactions.

To conceal his ongoing scheme of evading taxes by diverting cash from the law practice, the Defendant structured the bank deposits of cash payments made to the firm. In so doing, he prevented the filing of both of the foregoing types of currency reports, which reduced the likelihood that the government would learn the true amount of income his law firm was receiving.

First, the Defendant handled the law firm's receipt of checks and cash differently in order to prevent his bank from filing a Currency Transaction Report (CTR) on the cash received. On most business days, the Defendant would receive a combination of checks and cash. The checks were almost always deposited within two business days. The cash, however, especially aggregated daily receipts exceeding $10,000, were not deposited in one lump sum into the business account the next business. Instead, the Defendant hoarded some of the cash, then he took the remaining cash and divided it into smaller bank deposits under $10,000 over multiple days, commingling the cash deposits with checks received on subsequent days.

For example, on October 18, 2007, the Defendant received a $30,000 legal fee to represent a federal client, hereinafter "Client One." Client One gave the Defendant a check for $12,000 and $15,000 in cash (the balance of $3,000 was later paid in cash). The check was deposited into the law firm's account two business days later on October 22, 2007, along with checks from other clients. The only cash deposit made that day was for $2,500 and it was deposited into the Defendant's personal account. There was no cash deposit into either account on that day or any subsequent day equal to the $15,000 in cash that the Defendant had received.

4

According to the Defendant's ledger for the week ending October 19, 2007, eleven other clients had paid him an additional $12,090 in cash for a total of $27,090 in cash payments that week, and four had paid him an additional $2,300 in checks for a total of $14,300 in checks that week. All the checks were deposited within a couple of days of the ledger entry, but not all of the cash. In addition to the aforementioned $2,500 deposited into the personal account on October 22, 2007, $5,000 of the cash was deposited into the business account on November 11, 2007, and two deposits of cash totaling $4,000 were made into the personal account on November 5 and 7, 2007. Thus, instead of depositing the $27,090 in cash a day or two after it was received as he had done with the checks, which would have triggered the filing of at least one CTR by the bank, the Defendant avoided the CTR by hoarding $15,590 of the cash and dividing the balance of $11,500 into four cash deposits over four different dates in two different bank accounts.

Similarly, for the week ending January 5, 2007, the Defendant's ledger reflected the receipt of $18,040 in cash from thirteen clients and $7,000 in checks from three clients. Two of the three checks were deposited the next business day on January 8, 2007 (the disposition of the third check could not be determined). Only two cash deposits related to that week could be located. There was one cash deposit for $7,000 into the business account on January 4, 2007 and another one for $6,000 on January 12, 2007. Thus, instead of depositing all of the $18,040 of aggregated cash receipts in one or two transactions, which would have triggered the filing of a CTR, the Defendant avoided the CTR by hoarding $5,040 of the cash and dividing the balance of $13,000 over two different dates.

During the execution of the search warrant at the Needleman residence on April 14, 2011, agents discovered and seized a document labeled "Form 8300". Entries had been made on the form indicating that the Defendant had received $13,000 in cash on behalf of Client Two on April 10, 2010. The Form 8300 was never filed with the IRS. The entries the Defendant made in his ledger for Client Two also reflected the receipt of $13,000 in cash on that same date. However, there were no deposits for that exact amount in any of the Defendant's bank accounts. Furthermore, between April 2, 2010 (the date of the most recent deposit) and April 10, 2010, the Defendant noted in his ledger the receipt of an additional $15,400 in cash, and between April 11 and 14, 2010, he noted the receipt of another $5,550 in cash. Of the $33,950 in cash received

5

between April 2, 2010 and April 14, 2010, the Defendant deposited only $11,500 of it and he did so in two separate deposits under $10,000, one for $8,000 on April 12, 2010 and another $3,500 on April 14, 2010.

This pattern of managing the firm's cash deposits to avoid the filing of CTRs was consistent over the five years since January 1, 2006. Indeed, in contrast to the fact that there were a large number of daily deposits of aggregated checks totaling more than $10,000 in unrounded amounts, every single one of the 115 cash deposits during that period was less than $10,000 and all of them were made in rounded off amounts, such as $7500 or $6000. The disparity is even more remarkable in light of the fact that the vast majority of the firm's clients paid in cash and the average total cash deposits per year was approximately $250,000. The Defendant's pattern of structuring the deposit of cash receipts and the consequential hoarding of $1.15 million dollars in the safes in his basement, resulted in more than $100,000 being structured in a twelve-month span over the five-year period, including the 2007 calendar year.

      b.    **The Defendant's Failure to File a Form 8300**

The second aspect of the Defendant's structuring of cash deposits involved his failure to file a Form 8300 on occasions when he received more than $10,000 in cash from a single client in one or more related transactions. Within 15 days of receiving such a payment, the Defendant was required to file Form 8300 reporting the transaction. For example, and as noted above, on October 18, 2007, the Defendant received a $30,000 legal fee from Client One, $18,000 of which was in cash. As already noted, Client One's check was deposited into the law firm's account two business days later, but there was no cash deposit equal to the $18,000 the Defendant received and he did not file a Form 8300 reporting that cash transaction. It was only after a federal subpoena was issued a month later, seeking the payment information for Client One, that the Defendant chose to file a Form 8300.

Notwithstanding the large fees the Defendant charged for defending a federal case, the Form 8300 filed for Client One is the only time the Defendant filed the form for a client in the last five years. Indeed, from interviews of former clients represented by the Defendant during that period, federal agents know that other clients also paid the Defendant more than $10,000 in cash. As noted above, Client Two paid $13,000 in cash and a Form 8300 was never filed. Additionally,

Client Three gave the Defendant one payment of $20,000 in cash and Client Four paid $17,500 in cash, yet there are no bank deposits equal to those payments and no Form 8300 was ever filed. Furthermore, as to other federal clients who had hired the Defendant, federal agents found a series of small cash deposits spread over a series of days in close proximity to when the Defendant entered his appearance, but no large lump sum deposits were made and no Form 8300s were ever filed.

---

I have read this statement of facts and carefully reviewed it with my attorneys. I agree that the United States could prove these facts at trial and that I am guilty of the conduct described herein.

7/26/11
Date

*[signature]*
Stanley Needleman

7/26/11
Date

*[signature]*
Kenneth W. Ravenell, Esquire

7/26/11
Date

*[signature]*
William H. Murphy, Esquire