<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                        SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA     .

 4         vs.                    .  DOCKET RWT 11-0449

 5   STANLEY NEEDLEMAN            .  GREENBELT, MARYLAND

 6                                .  DECEMBER 15, 2011

 7

 8                     TRANSCRIPT OF SENTENCING
                  BEFORE THE HONORABLE ROGER W. TITUS
 9                  UNITED STATES DISTRICT JUDGE

10

11   A P P E A R A N C E S

12   FOR THE GOVERNMENT:          SANDRA WILKINSON, ESQ.
                                  MARTIN J. CLARKE, ESQ.
13                                ASSISTANT U.S. ATTORNEYS

14
     FOR THE DEFENDANT:           KENNETH W. RAVENELL, ESQ.
15                                WILLIAM H. MURPHY, ESQ.
                                  MILIN CHUN, ESQ.
16

17   Court Reporter:             Sharon O'Neill, RMR
                                  Official Court Reporter
18                                United States District Court
                                  6500 Cherrywood Lane
19                                Greenbelt, Maryland 20770
                                  301-344-3227
20

21

22

23

24

25
</pre>

IN THE UNITED STATES DISTRICT COURT

1            THE COURT:  You all jointly requested to meet with me

2     and the reporter, but in chambers, and I believe the purpose of

3     that is to address the Government's 5K1.1 motion, is that

4     correct?

5            MR. MURPHY:  That's correct.

6            THE COURT:  What I want to make sure that you all

7     understand is the court system in general, and I in particular,

8     are very sensitive about doing things not in public, but I

9     recognize there are circumstances in which a person's

10    cooperation could put them in significant risk of harm and,

11    therefore, I'm happy to try to accommodate that, but that's as

12    far as I'm going to go.

13           For example, the Government has argued for

14    enhancement of sophisticated means.  We're doing that out

15    there.

16           MR. RAVENELL:  Yes.

17           THE COURT:  The only thing I want to discuss in here

18    are the sensitive matters pertaining to his cooperation and the

19    risks -- the level of that cooperation and the risks associated

20    with it.  So, make your motion.

21           MS. WILKINSON:  Thank you, Your Honor.  For the

22    record --

23           THE COURT:  I have read all the papers.

24           MS. WILKINSON:  For the record, Sandy Wilkinson on

25    behalf of the United States Attorney's Office, and with me is

IN THE UNITED STATES DISTRICT COURT

1   Martin Clarke, who is my co-counsel in the case, and Special

2   Agent O'Keefe from DEA is here as our client agency, and I

3   appreciate the Court's time.

4           I agree with the Court about the other factors that

5   will go into determining Mr. Needleman's sentence today.  There

6   is some overlap which I'll address in a moment, but I want to

7   talk about the 5K.  The Government will be making a 5K 1.1

8   motion and had made a 5K1.1 motion recommending two levels on

9   behalf of Mr. Needleman for his cooperation in this case.

10          In addition, it's set forth, both in our letter and

11  in our plea agreement itself, Mr. Needleman is getting an

12  additional benefit from his cooperation, and tied directly to

13  his cooperation, and that's the non-prosecution agreement

14  regarding his wife, Marsha Needleman.

15          This is not an ordinary cooperation situation that we

16  have here, Your Honor.  The Government was quite aware that

17  there was a possible injustice floating around the Baltimore

18  City courthouse relating to the murder of a man by the name of

19  Robert long, and we learned this information not from Mr.

20  Needleman but from our sources, and we began in the middle of

21  our investigation of Mr. Needleman, gathering additional

22  information that led us to the conclusion that somebody else

23  had ordered the murder of Mr. Long and that somebody else was

24  Jose Morales, a long time client of Mr. Needleman.

25          The Court can see from reading all the paperwork that

IN THE UNITED STATES DISTRICT COURT

1   that was the nature, if you will, of the Government's inquiry

2   into the murder of Mr. Long, because we were looking into the

3   relationship of Mr. Morales and Mr. Needleman.

4           I say that by the fact that this is not an ordinary

5   cooperation case where an individual comes in who is a party to

6   some criminal activity and gives us historical information

7   about that.  Mr. Needleman was asked to cooperate with the

8   Government, and we were very firm in our decision to offer him

9   a plea agreement in this case, to make the concessions that we

10  did in the plea agreement, because we wanted his cooperation

11  and that is why some of the information that we have related to

12  the Rob Long murder comes from Jose Morales himself, and that

13  is an admission that he hired people, DMI, and that's in the

14  State's Attorney's disclosure letter that I proffered to the

15  Court.

16          THE COURT:  I saw that.

17          MS. WILKINSON:  When we provided that information to

18  the State's Attorney's Office originally, before Mr. Needleman

19  was cooperating, they obviously were troubled by the

20  information but, more importantly, because Mr. Morales was not

21  a beacon of the community, if you will, there was the need to

22  have that information, given that a jury had convicted someone

23  else of the killing of Mr. Long.

24          I believed, from Mr. Morales and other sources, that

25  Mr. Needleman had information relevant to that, and I

IN THE UNITED STATES DISTRICT COURT

1  approached Mr. Murphy and Mr. Ravenell very early on after our

2  search warrant of Mr. Needleman, for his cooperation in this

3  matter, and I believed he could help me on this one relevant

4  point and, in fact, that's all we're taking about here,

5  cooperating in this one relevant point, and that's the

6  cooperation of Jose Morales that he hired someone else to kill

7  Mr. Long.

8          THE COURT:  What is the status, if any, of any

9  corroboration of Mr. Morales for that?

10         MS. WILKINSON:  I can only speak to what is in the

11 public record right now, Your Honor, and Mr. Morales's

12 information is set forth in the State's Attorney's disclosure

13 letter, pursuant to a proffer, the statement that he had

14 provided, and he's currently charged with a drug trafficking

15 charge that, Your Honor, actually is pending before the Court.

16         THE COURT:  You told me why I had to figure it out,

17 why I have these Baltimore cases.

18         MS. WILKINSON:  Well, because this one came to you

19 first and was a recusal from the Baltimore City judges, and

20 because Mr. Long's murder is related to this, and Mr. Morales

21 found its way to Your Honor's chambers.  But that is what we're

22 talking about here, corroboration of Morales through the

23 statement of Mr. Needleman and the information that he has

24 provided.

25         Now, we need to step back and look at the

IN THE UNITED STATES DISTRICT COURT

1  circumstances of Mr. Needleman's case, because in an ordinary

2  case you have a lawyer that's going to talk about an important

3  fact in your trial, and that is critical and that is really

4  important cooperation, and I don't mean to minimize it, it

5  certainly is, but, unfortunately, given the circumstances of

6  this case and unfortunately the way that Mr. Needleman was

7  doing business for a few years, I have to try to corroborate

8  him as well.

9          I can't just rely on his word and this is why.  The

10  reason why we believed Jose Morales when he provided the

11  information is a series of events that happened leading up to

12  Rob Long's murder and that is that Mr. Needleman had hired --

13  strike that -- not had hired his tenant, a lawyer in his

14  office, a junior lawyer, became, on Mr. Needleman's referral,

15  the attorney for the co-defendant in this case.  That's Rob

16  Long, the murder victim, and that it was Mr. Needleman who had

17  provided the cash.

18          I don't know where the cash came from, from a third

19  party source, but the five hundred that was used to pay

20  Mr. Likas, the attorney, to represent Mr. Morales's

21  co-defendant.  So what we have here now are two lawyers, same

22  office building, one in a tenant relationship and a junior

23  relationship to Mr. Murphy (sic) who is representing the murder

24  victim, the co-defendant in this case.

25          Fast forward to March of 2008, and that co-defendant

IN THE UNITED STATES DISTRICT COURT

1  makes a decision to cooperate against Mr. Morales, and the

2  information that we had at that point was that Mr. Needleman

3  had reached out to determine whether or not the cooperator was

4  in fact cooperating against Mr. Morales, and he did so first by

5  calling the State's Attorney's Office, who appropriately

6  declined to comment upon that.

7          And then Mr. Needleman reached out to -- otherwise to

8  confirm that Mr. Long was cooperating.  This is where the

9  defense and the Government are largely divergent about the

10  appropriateness of Mr. Needleman's conduct in this case,

11  whether he had a duty to find out from Mr. Morales that his

12  co-defendant was cooperating against him.

13          Mr. Morales, who had a long criminal history, who was

14  pending charges for either assault or intimidating a witness,

15  something that was known to Mr. Needleman at the time.

16          Instead, Mr. Needleman got that information about the

17  cooperation of Rob Long from another source and provided that

18  information to Jose Morales.  Three days later Mr. Long is

19  dead.

20          THE COURT:  He got that from the other attorney,

21  that's what it looks like.

22          MS. WILKINSON:  Mr. Morales advises that he got the

23  information from Mr. Needleman.  I want to be careful about

24  where the source of the information came from, because Mr.

25  Needleman obviously provided some information as a cooperator,

IN THE UNITED STATES DISTRICT COURT

1    but I want to talk about the third party information that I had

2    even before Mr. Needleman confirmed what, in fact, had

3    happened.

4         At that point, Your Honor, what happened with regard

5    to Mr. Needleman is that Jose Morales advises us that he tells

6    Mr. Needleman that he had hired the people to kill Mr. Long, a

7    conundrum for any attorney, certainly, and I am not here to

8    talk about what an attorney should or shouldn't do in those

9    circumstances, or at least what he should do.

10        One might think that one might call bar counsel or

11   consult about what happened but, instead, what the record shows

12   and what the facts show, and was is most troubling to the

13   Government, and I think mitigates against some of the

14   importance -- not the importance but the purposefulness, the

15   bang of Mr. Needleman's cooperation, is that he continued his

16   relationship with Mr. Morales and that relationship continued

17   through the summer of 2008, when Mr. Morales is arrested for

18   failure to appear on some cases that Mr. Needleman is

19   representing him on.

20        And so we learned that Mr. Morales was given a no

21   bond and needed $30,000.00 in cash to get out of jail, and that

22   that money came directly from Mr. Needleman himself, through a

23   conduit, a son of a good friend of Mr. Needleman's, the

24   Modells, who would pay that $30,000.00 in cash.

25        Thus the tie-in to the case we have here, because we

IN THE UNITED STATES DISTRICT COURT

1    have all of this untraced cash that we find in Mr. Needleman's

2    safe that is the subject of the charges that the Court is

3    considering.

4           So the Government is in quite a conundrum here.   We

5    have an attorney who has not behaved ethically.   We have him

6    corroborating the statement of a known killer, or an admitted

7    killer at this point, and it's not just an ordinary murder

8    case.   It's a murder case that the Government feels strongly

9    about because of the principle that it stands for.

10          This a man who is innocent, has been convicted of a

11   murder that he didn't commit, and the Government's effort to

12   undo that wrong starts with Jose Morales and Mr. Needleman.

13   And although I appreciate Mr. Needleman's Candor in coming and

14   talking to us in July of 2008, 2011 actually, I believe that he

15   did so because of the charge that he had facing him.

16          At some point he learned that Mr. Morales had tried

17   to cooperate against him in the drug case that he had in Texas,

18   providing further motivation for his statement, if you will,

19   and certainly affects his credibility and the ability to

20   cross-examine him by seasoned counsel about the credibility of

21   what he's saying, and I'm left in square one, what I told Your

22   Honor before, about the need, unfortunately, to have to

23   corroborate everything that Mr. Needleman told me.

24          Now, fortunately, the phone records make Mr.

25   Needleman look bad in all of that, but this corroborates the

IN THE UNITED STATES DISTRICT COURT

1   story that I have as well from him, and I believe him.   I

2   believe that he was provided a confession from Jose Morales.

3   There are facts that I still need to work on in terms of

4   understanding the whole truth of what happened, particularly in

5   our ability to undo something that a jury did up in Baltimore

6   City, and it's way complicated, as Your Honor can imagine, but

7   I'm left in this awkward position, as I have talked with Mr.

8   Murphy and Mr. Ravenell numerous times of "Yes, I am making

9   this 5K motion."

10          I believe that the two levels that we're recommending

11   are more than generous for the situation that we are presented

12   with here; that we made an incredible concession with regard to

13   his wife, and that the circumstances that led us all here is

14   unpleasant.

15          It is unpleasant for Mr. Needleman, and in an

16   ordinary case it always is for cooperators, but to have a

17   lawyer in the midst of all this as well.   I think Your Honor

18   probably knows, this is not the only case where we're had

19   trouble with lawyers providing cooperating information,

20   alleging the murder of a witness, and that's where we are and

21   the Government feels very strongly about our recommendation in

22   this case.

23          We've talked about it at length.   We've considered

24   Mr. Needleman's credibility.   Yes, we met with him four times.

25   Yes, we put him in the Grand Jury.   All of that is important,

IN THE UNITED STATES DISTRICT COURT

1    and I am not here to say that his statements are not important

2    to what we have, but we have a long road ahead of us at this

3    point.

4               I do want to address the one issue about safety.  I

5    talked to Mr. Ravenell about this and Mr. Murphy at length and,

6    again, I'm not here to say that the gang that Mr. Needleman

7    provided indirect information about is not a bad gang,

8    obviously they are.  The Government has a pending prosecution

9    of a number of them.

10              In fact, Mr. Morales represents, at least according

11   to one witness, he was characterized as the leader of that

12   gang.  I think there is still a pending case up in Baltimore.

13              Obviously, Mr. Needleman is no longer his attorney,

14   but I am not here to say that that gang is not dangerous, but

15   there is some irony in what we are talking about here, Your

16   Honor, in that Mr. Needleman would rely and ask this Court to

17   mitigate against the circumstances in this case and go under

18   the Government's recommendation of what we believe the

19   appropriate concession would be of cooperation here because he

20   is in danger, when truthfully, Your Honor, it is his conduct in

21   part that led to the death of another man by this very gang.

22              THE COURT:  I had this from the papers, and you all

23   gave me a lot of papers.

24              MS. WILKINSON:  I understand that, Your Honor.  I

25   apologize.

IN THE UNITED STATES DISTRICT COURT

1           THE COURT:  The location rented by somebody in his

2   office, the relationship between the two proprietors.

3           MS. WILKINSON:  Referrals.

4           THE COURT:  Whatever it is, but he got information

5   from that attorney that there was cooperation by Long.

6           MS. WILKINSON:  Indeed, Your Honor.

7           THE COURT:  And the next think we know, Long is dead.

8           MS. WILKINSON:  That information comes from -- that

9   information comes from Mr. Needleman's Grand Jury testimony.

10           THE COURT:  Right.

11           MS. WILKINSON:  Obviously, I have information from

12   other sources and it's not as clear cut, and that's the problem

13   that I'm having, that there are inconsistencies among what

14   Mr. Likas, Mr. Morales and Mr. Needleman are telling me, all

15   three of them, in the course of the events that led to

16   Mr. Long's murder and, you know, and that's what I'm advising

17   the Court.

18           THE COURT:  You're saying they're inconsistent in

19   what they're saying?

20           MS. WILKINSON:  Inconsistent about what happened,

21   both before and after the murder.

22           THE COURT:  Well, is there anything, any question

23   that Mr. Needleman advised Morales of the cooperation of Long?

24           MS. WILKINSON:  No.

25           THE COURT:  There is no question about that?

IN THE UNITED STATES DISTRICT COURT

1          MS. WILKINSON:  No, because the only two people that

2   know about that are Mr. Morales and Mr. Needleman.

3          THE COURT:  Okay.

4          MS. WILKINSON:  That is not where the inconsistency

5   is.  It's a little difficult to talk about what other witnesses

6   --

7          THE COURT:  If I understand what you're saying, while

8   he has been of assistance to the Government and has provided

9   you with information that's helpful, that he isn't going to be

10  real helpful in the courtroom.

11         MS. WILKINSON:  He is going to be helpful, but I'm

12  going to have to do a lot of work.

13         THE COURT:  Damage control on him as a witness.

14         MS. WILKINSON:  I am, indeed.

15         THE COURT:  Circumstances including this person's

16  death.

17         MS. WILKINSON:  Absolutely.  I would also add, Your

18  Honor, I have come to the Court before on many circumstances

19  and ask for cooperation to go up levels.  I have people that

20  have been out on the street, worn body wires, and had an

21  instance of a woman who went to prison, wore a wire to get her

22  baby's father to testify, make a confession regarding a murder

23  in a bank robbery case, and I have got to battle for those

24  cooperators, and I feel strongly about the use of people

25  cooperating, people who truly have remorse, coming forward and

IN THE UNITED STATES DISTRICT COURT

1    want to help themself and the Government here.

2            I will add, and this goes -- I have not heard and I

3    will be glad to hear what Mr. Ravenell and Mr. Murphy say about

4    this, but in all of the times when we talked about Mr.

5    Needleman's cooperation in this case, I have never heard him

6    say to me "You know, what happened to that man is wrong.  What

7    happened to Mr. Smith, the man that was locked up, that's

8    wrong."   I haven't heard that yet out of his mouth.

9            I have not heard that yet in this whole case, and I'm

10   left with a man who has an admittedly tainted or tarnished

11   relationship with a client, long term, eight, nine year

12   relationship at the time, seven or eight, I should say.  They

13   started in 2001.  It's an unpleasant situation and it does make

14   him vulnerable as a witness in court.

15           I'm working hard to corroborate him.  It was

16   important and, certainly, the State's Attorney's Office, I have

17   told Mr. Murphy and Mr. Ravenell that they certainly found it

18   important, that Mr. Needleman was the additional reason why

19   they made the disclosure at the Baltimore City State's

20   Attorney's Office.

21           They had the information about Mr. Morales long

22   before they knew about Mr. Needleman, and it was my

23   understanding that it was Mr. Needleman's additional nail, if

24   you will, that provided the disclosure to the defense.  I am

25   not sure why about all that timing, but I understand that it

IN THE UNITED STATES DISTRICT COURT

1   was Mr. Needleman, that did result in that disclosure.

2          And so, obviously, he is someone that people in the

3   City know.  Unfortunately, I don't know everything about Mr.

4   Needleman and that's part of what today is going to be about,

5   but this is my problem and that's why I feel so strongly about

6   our recommendations here.

7          We have made huge concessions for Mr. Needleman in

8   this case.  He provided me information in a very important

9   matter to the criminal justice system as a matter of principle,

10  but we made concessions too.  We agreed to a guideline

11  recommendation.  We agreed not to prosecutor his wife, who I

12  think I demonstrated to the Court has substantial criminal

13  liability here, and we have made a two level downward departure

14  recommendation, which is consistent with our office policy for

15  people who provide historical information outside the case.

16          THE COURT:  Okay.

17          MR. RAVENELL:  Let me respond to all that was said.

18  Let me start off with stating that the suggestion by the

19  Government that a two level recommendation is more than

20  generous, obviously we disagree for all the reasons we have set

21  forth in our response.

22          It's somewhat shocking to hear some of the comments

23  in the way it has been posed.  The suggestion that Mr.

24  Needleman is somehow a very damaged witness is just the

25  Government's effort to try to get the Court to go along with

IN THE UNITED STATES DISTRICT COURT

1    two levels.  That's all it is.

2            This man has been placed before the Grand Jury on two

3    occasions.  The Government has made it clear to us they intend

4    to call him to testify in any prosecution that they bring.  He

5    is going to be called either by the State, more than likely the

6    defense attorneys in the Smith case, the Demetrius Smith case

7    in Baltimore City, if that is necessary.  So to suggest that

8    he's going to be damaged goods for them is just wrong.

9            Now, to suggest that any witness, because they could

10   be cross-examined, somehow is not entitled to more levels.

11   Judge, you have sat here.  I have been in many courts.  I have

12   represented cooperators.  I have cross-examined cooperators, by

13   far worse than what the Government suggested here, and they

14   have gotten much more than two levels for cooperating without

15   putting themselves in the danger that Mr. Needleman has, no one

16   from the criminal milieu, is putting himself at risk for, so we

17   take offense to the suggestion that what he's doing is not much

18   of a corroboration.

19           The Government points out it was Mr. Needleman's

20   agreement to cooperate that got their case off the ground.

21   They knew about Mr. Morales's comments in his proffer sometime

22   ago that he had this person killed.  The States Attorneys

23   Office knew about it.  They did nothing with that information

24   until Mr. Needleman came forward.

25           Now they are saying they have a man who is innocent

IN THE UNITED STATES DISTRICT COURT

1    and they want him to be free.  We support that.  Mr. Needleman

2    supports that, and he is putting himself out there to do it,

3    and to suggest that that is all that he is entitled to is two

4    levels is just wrong.

5              Secondly, Judge, the comment that Mr. Needleman did

6    something wrong because he, while representing his client,

7    learned of a witness against the client and that he then told

8    his client who the witness was, that he has done something

9    wrong.  I think the Court well knows that he had every ethical

10   obligation to talk to his client about who a witness is.

11             For example, if the States Attorneys Office, as they

12   would have to have done, and the State Government acknowledges,

13   told Mr. Needleman that Rob Long was a cooperator, which he

14   would have had to have done at some point before they put him

15   on the witness stand.

16             What was he going to do?  Not tell his client that

17   this person was a witness?  It was going to come out.  So,

18   look, bad things happen in this system.  We've all seen bad

19   things happen.

20             THE COURT:  Well, how he found out about this is not

21   something I'm real comfortable with.

22             MR. RAVENELL:  The Government is making a big point

23   about this.

24             THE COURT:  Two lawyers in an office representing

25   co-defendants in a case.  I don't care if it's

IN THE UNITED STATES DISTRICT COURT

1   employer\employee.  Whatever it is, that's a dicey situation

2   and you end up with something as unfortunate as this could

3   happen.

4           MR. RAVENELL:  I'm not sure that the Court is talking

5   about a dicey situation about Mr. Needleman representing one

6   and Mr. Likas representing one.

7           THE COURT:  Well, it's clear if they were partners it

8   makes it simple that there would be a huge drill that the court

9   system would have the go through to approve joint

10  representation, representation by the same law firm of two

11  defendants in a case because of precisely the problem we're

12  talking about here, that one defendant's cooperation becomes

13  known to the other, when it should be kept walled off.

14          These people should be in different firms.  Here it's

15  a little different.  I have people leasing space from one

16  another, but in the same shop, and information is disclosed by

17  one attorney to another that shouldn't have been.

18          MR. RAVENELL:  Well, Judge --

19          MR. MURPHY:  Under the State system the Government

20  could not have kept that information secret.  I'm sure that

21  Mr. Likas being an experienced lawyer --

22          MR. RAVENELL:  And former prosecutor.

23          MR. MURPHY -- also knew what the Government, contrary

24  to what the Government has over on this side, had the absolute

25  obligation to tell Mr. Needleman that Rob Long was going to be

1    a witness against his client.  That's just well settled in

2    Maryland.  And so it would be perfectly reasonable for Mr. Long

3    knowing that -- Mr. Likas rather -- that it was going to come

4    out anyway, to tell Mr. Needleman.

5             Now, there is no -- there is nothing wrong with Mr.

6    Needleman asking Mr. Likas.  I would do it.  I don't know any

7    reputable defense lawyer who would not have turned over heaven

8    and earth to find out that information.  And it is not Mr.

9    Needleman's responsibility that Mr. Likas told him earlier than

10   the State was obligated to tell him, and I don't know whether

11   that is true.  There is no evidence that it was an earlier

12   disclosure than what the state was obliged to give, so I see no

13   misconduct by Mr. Needleman and --

14            THE COURT:  I was talking about a dicey situation

15   where you have people in the same office together, with

16   information that would not ordinarily be imparted between

17   lawyers that would be in different places.

18            MR. MURPHY:  My point is, Your Honor --

19            THE COURT:  It doesn't mean one lawyer couldn't call

20   the other lawyer up on the phone and ask for that.  The person

21   disclosing the information may have done something pretty bad

22   too.

23            MR. MURPHY:  Well, it doesn't mean that it was

24   unethical, because it was inevitable that Mr. Needleman would

25   find out.

IN THE UNITED STATES DISTRICT COURT

1          THE COURT:  Not necessarily, but I am not here to

2    debate the ethics of the other lawyer.

3          MR. MURPHY:  I understand that, but there is nothing

4    wrong with Mr. Needleman asking the lawyer --

5          MR. RAVENELL:  Or the prosecutor.  That's what people

6    do.  You try to find out.

7          THE COURT:  Let me hear what your position is on the

8    5K.  I assume it should be granted.  You asked for an eight

9    level downward departure instead of two.  Tell me why it should

10   be an extra six.

11         MR. RAVENELL:  Five factors the Court is required to

12   consider when determining what the level should be.  We have

13   sat forth those factors in the papers.  You're aware of them,

14   but there are a couple of key factors there; one is the

15   significance and usefulness of his cooperation.

16         Now, I think we all can agree that it's significant

17   because, as we have just had this discussion, without Mr.

18   Needleman coming forward and meeting with the Government.  The

19   Government said that he came forward after he got arrested.

20   That's kind of when most cooperators come forward, when

21   something happens.

22         He came forward.  Didn't have to.  He could have

23   refused to cooperate.  Early on he said "I'll cooperate and

24   answer all your questions," and he did.  And the information is

25   very useful.  It's useful in two ways.  One, it's going to be

1   used and is being used in an effort to free an innocent man who

2   is serving, I believe, a life sentence on his murder

3   conviction.  So that is certainly significant.

4           Secondly, it is already being used by the Government,

5   has been use in presentation to the Grand Jury on two

6   occasions, and will be used as a witness, Mr. Needleman, in

7   trials in two different courts.

8           So, Your Honor, it is very clear whatever spin the

9   Government wants to put on it now, that it is useful and

10  significant information that he has provided.  That is a very

11  key factor.

12          Another key factor the Court is to consider is the

13  danger that any cooperation poses for the defendant and/or his

14  family.  Now, we have set forth in our papers, Judge, this DMI

15  group, that's one of the reasons we're having this conversation

16  here in chambers, because they are a very dangerous gang, 22

17  members indicted.  We know that they not above, even in this

18  case, to be out there, to be hired to commit murders.

19          The Government has alleged in their indictment that

20  is pending in the courts that they do just that, that they're

21  notorious in all the prisons in Maryland, and quiet a few of

22  the federal prisons, and their reach has continued to grow.

23  That they use cell phones in and out of prisons.

24          We know that Mr. Morales, in the allegations here,

25  who certainly must have some strong enough connections to DMI

IN THE UNITED STATES DISTRICT COURT

1    to get them to go out and commit murder, was smuggling drugs

2    into the institution, the Government is alleging in the current

3    indictment, while he was in federal prison.

4            If they're able to get drugs into the institution,

5    they are certainly able to do harm to Mr. Needleman while he is

6    in the institution, and to have people do harm to Mr.

7    Needleman.  He was aware of that and, as we pointed out in our

8    papers, Mr. Needleman sat down with the Government.  One of the

9    things he said "I know that this is putting my life in danger,

10   to talk to you, what I'm about to talk to you about, but I'm

11   going to do it anyway."

12           And he also puts his family at risk.  These people

13   are not above reaching out and harming a cooperator's family as

14   well.  So, we're talking about Mr. Needleman reaching out to

15   the Government.  They came to us and said "We want to talk to

16   Mr. Needleman."  He said "I'll do it."

17           Let me address one other thing, Judge, while I'm

18   here.  We're very disappointed.  Even after our proffer last

19   night, the Government sits before you and tells you that some

20   how this is a consideration for the non-prosecution of his

21   wife.  It just never happened.  It was never a conversation

22   that it would be tied to the lack of prosecution for his wife.

23           We met with the Government.  We said that Mr.

24   Needleman was willing to come in and talk to them if they in

25   fact would agree not to prosecute his wife.  They said

IN THE UNITED STATES DISTRICT COURT

1   originally that they wouldn't, and we said Mr. Needleman was

2   not willing to come in and talk unless that was going to

3   happen.  Those were the conversations.

4            We did not sit down with the Government at any point

5   and have a conversation that there are levels of cooperating

6   that they are going to recommend that would be tied to anybody.

7   They never suggested it.  We had most of our conversations

8   about the agreement, Mr. Murphy and I, with Mr. Clarke, and we

9   had quite an few of them back and forth about what was going to

10  happen with an agreement, and it is absolutely not fair, even

11  false, to suggest to you that what happened was that there was

12  some kind of a trade-off about the levels they would recommend

13  for Mr. Needleman's cooperation because of the non-prosecution

14  of his wife.

15           Now, what happened is that you made a comment on the

16  phone the other day -- I don't even remember what the comment

17  was -- we were talking to you and immediately whatever it is

18  that you said that caused Ms. Wilkinson some concern, she said

19  "I'm going to respond to what you said, Judge, and I'm going to

20  now tell you that there is a reason why we're making this

21  recommendation of only two levels."  I think you had made the

22  comment about them being stingy with their level of

23  cooperation.

24           THE COURT:  I don't recall saying that.

25           MR. RAVENELL:  I think it was something like that.

IN THE UNITED STATES DISTRICT COURT

1          THE COURT:  Well, I have many times on the record

2     said that this office's policy of two and two is this office's

3     policy.  It's not with the guidelines and that we -- that

4     they're fairly conservative, not stingy, in relation to some

5     other United States Attorney's Offices in this area.

6          MR. RAVENELL:  Sure.

7          THE COURT:  But I don't think I said they were

8     stingy.

9          MR. RAVENELL:  Judge, I'm just telling you that she

10    responded, as she pointed out in her letter there, based on

11    your comments, she responded.  She didn't set forth the

12    comments.  There weren't many that, you may add, all that would

13    cause one to write this letter, that misrepresents what the

14    conversations were between the parties leading up to that

15    discussion.

16         Now, we made it very clear that Mr. Needleman

17    intended to cooperate, and what was important for us was to

18    have as part of the agreement that we could argue for

19    additional levels for his cooperation.

20         THE COURT:  Right.  You reserved that right.  No

21    question about it.

22         MR. RAVENELL:  My point is, if there was some kind of

23    agreement that this was tied into non-prosecution of his wife,

24    would you accept the agreement.

25         THE COURT:  The agreement is what it is.  I have read

IN THE UNITED STATES DISTRICT COURT

1    it.  It simply said that if he provides truthful information

2    they wouldn't prosecute his wife; not whether it was a high end

3    level of assistance, not whether they made the motions or not.

4            It's a standard paragraph, provide truthful

5    information.  Untruthful information doesn't help them, they

6    agree.

7            MR. RAVENELL:  Exactly.

8            THE COURT:  I can read it and understand the context.

9    You don't need to spend too much time on that one.

10           MR. RAVENELL:  Where we are now, when you look at the

11   reasons for additional levels, two levels, you have many

12   individual who come before you and don't do what this man is

13   doing and receive more than two levels.

14           And, look, I'm not suggesting that someone who comes

15   before you who is involved in the drug trade or some other

16   types of violence, that they should not be concerned for their

17   safety as well.  Anyone who is cooperating against this kind of

18   group, this gang -- you can cooperate against some people,

19   white collar, where you're not going to face somebody coming

20   back and trying to harm you.

21           That is why there is a particular factor that deals

22   with the danger to a particular individual and his family, and

23   that danger is here and present.  The Government makes

24   reference to it in their memorandum, put it in a footnote, but

25   we are not footnoting.  It was real, and Mr. Needleman

IN THE UNITED STATES DISTRICT COURT

1   recognizes the reality of it, yet he has come forward and said

2   "I'm willing to testify and will continue."

3          After this day is over and you've given the sentence,

4   whether it be probation or jail, whatever it is, he's going to

5   be called as a witness, if the Government's case goes as they

6   wish it to go.  We all know that, that it is rare the

7   Government doesn't get an indictment if they seek one.  He is

8   going to come forth and testify and he's going to testify

9   truthfully and consistent with what he has said so far.

10          And when Mr. Foster, who represents Demetrius Smith

11  on the State side -- we have spoken to the attorneys who

12  represented Mr. Smith before, and they have told us that they

13  would want Mr. Needleman available, and we told them he will be

14  available.  He will do whatever is necessary from today forward

15  and beyond to give the information that's going to be helpful

16  to free an innocent man and incarcerate those who committed the

17  crime.  So for these reasons --

18          THE COURT:  What's the status of the prosecution of

19  this outfit, the Dead Man Incorporated.

20          MR. RAVENELL:  They have been indicted.

21          THE COURT:  Is that the case before Judge Bennett?

22          MR. RAVENELL:  Indicted.  We have not checked.  It's

23  a very new case.  I don't think there have been -- certainly no

24  trials have occurred at this point, but at some point, Judge,

25  real soon Mr. Needleman's cooperation is going to become very

IN THE UNITED STATES DISTRICT COURT

1    public to all and DMI will know and Mr. Morales will know and

2    Mr. Morales hired DMI in the past to have someone killed.  I

3    will leave it there.

4         MR. MURPHY:  Your Honor, let me deal with one

5    additional aspect of the danger, because it's really easy for

6    us, in relatively protected situations, to rationalize how

7    dangerous what Mr. Needleman has agreed to do.  Back when I

8    first broke in, 41 years ago, the conversation between the jail

9    guards in prison kind of went like this:

10        "If you misbehave, Mr. Jones, one more time, I'm

11   going to take out the stick and I'm going to do something about

12   it."  And, so, whenever the guards wanted to be in charge, they

13   were in charge.  And the result, the retort, would generally be

14   "Don't hurt me.  I'm not going to get involved.  Blah.  Blah.

15   Blah."

16        Today the conversation between a jail guard and the

17   prisoner is like this:  "Jones, if you do that again I'm going

18   to have to take action against you," and the prisoner responds

19   "Officer Green, you're wife's name is Shirley, isn't it?  Yeah.

20   She's, I believe, 27 years old.  You got two kind, don't you,

21   and one of them is named little Charles.  He's 11, and the

22   other's name is Sally, she's nine, and those kids go to school

23   over at Falstaff Middle School, don't they, and I think they

24   take the bus every day, don't they?

25        "Now, Guard, bring me my heroin tomorrow and I want

IN THE UNITED STATES DISTRICT COURT

1   you to deliver it to me personally.  Do we understand each

2   other."  That's the conversation that goes on in prison today

3   between prison guards and prisoners, because the guard knows

4   that when they are dealing with an inmate, that inmate isn't a

5   stand alone any more.  He has tentacles and it's an easy matter

6   for a gang member to make sure that the guard's family is

7   intimidated.

8          You wouldn't hear about it because guards don't tell.

9   It's too dangerous an operation.  Guards don't snitch because

10  they have to go back into the prison system where they can get

11  shanked.

12         That's the environment that Mr. Needleman, if the

13  Government's wishes come true, will go.  And it would be a

14  cruel twist of faith if while waiting to cooperate to free an

15  innocent man, Mr. Needleman gets killed in prison.  Wouldn't

16  that be something.

17         And there is not a single person in here, Judge, who

18  can warrant that away.  The prison system can't warrant it

19  away.  The prison system's ability to protect cooperators has

20  gotten increasingly less reliable because of the gang problem

21  and because of the inability to deal with the problem that

22  gangs corrupt guards, and they have the tools and the tentacles

23  to do it.

24         And so we're very concerned, not only about

25  Mr. Needleman's safety, but about the Government's lack of

IN THE UNITED STATES DISTRICT COURT

1    concern about his safety.  Say what they will, one fact is

2    plain as day, Judge.  Mr. Needleman is risking his life and he

3    will risk his life on more than one occasion, because he will

4    be called as a witness at least three times.

5          First, he has already done it in the Grand Jury.

6    Second, he will have to testify publicly if and when the

7    Government brings its murder charges against DMI and, third, he

8    will be testifying in state court on behalf of either the

9    prosecution if it determines that it wants to justify releasing

10   the wrongfully convicted man, or by the defense if the defense

11   has to have a full blown hearing, which is the current posture

12   of the State's Attorney's Office in Baltimore.

13         Their currency posture is they are going to let this

14   play out in the other court, so it will be a defense lawyer

15   that has to call Mr. Needleman to testify.

16         Now, I can think of hundreds of people who would not

17   have cooperated at this price.  And this is a lawyer.  This is

18   a lawyer.  Let me tell you a little bit about DMI, Judge.  You

19   read our paper.  DMI is a gang that's extraordinarily violent.

20   The Government admits that in other places.  If you get the DMI

21   case, they are going to tell you how violent this gang is.  It

22   will curl that straight hair of yours, Your Honor.

23         THE COURT:  What straight hair?  Would that I had

24   some.

25         MR. MURPHY:  You can always do what I do, Judge, and

IN THE UNITED STATES DISTRICT COURT

1   leave it long in the back.  You're going to hear blood curdling

2   tails about the reach of this extraordinarily violent gang, and

3   about their ability to exterminate things that we take for

4   granted can't be exterminated, about how they communicate with

5   other gangs, because gangs all have a mutual interest in

6   exterminating people that they consider snitches.

7           DMI led the list of people that aggressively look for

8   people who are cooperating against their own members and other

9   kinds of cooperators, because they take the position that all

10  cooperators should die.

11          You saw the controversy in Baltimore about snitches

12  should die and the videos that came out about that.

13          THE COURT:  Yeah.

14          MR. MURPHY:  Well, that happens to be gang rule; that

15  happens to be the way the gang plays the game.  So somebody is

16  going to find out, probably within days of Mr. Needleman

17  entering the federal system, that Mr. Needleman has cooperated

18  with the Government and somebody is going to try to kill Mr.

19  Needleman.

20          I don't want that blood on my hands, and I don't

21  think the Government would want it on its hands, because public

22  policy is that the Government should protect people who

23  cooperate with them at the risk of their lives.

24          And, so, if they realize that they didn't do what

25  they could have done to protect Mr. Needleman from harm, that

IN THE UNITED STATES DISTRICT COURT

1   people will be reluctant to come forward in the future.  And

2   this is an increasingly worsening situation because, Judge, it

3   is, I understand, getting better in prison.  We all know that,

4   and so yesterday's news is always a little bit better than

5   today's news about how people are being treated in prison and

6   so here's what the only alternative that the prison system can

7   provide.

8           And if you want expert testimony on that, we can

9   produce it.  That when he gets threaten, or if it's known in

10  advance that he's going to be threaten or killed or harmed,

11  they have to put him in the SHU, the SHU, as it is called in

12  jail, is solitary confinement.

13          No exercise privileges because that's too dangerous.

14  Can't go in with the others, with other prisoners; can't clear

15  the yard because it's too inconvenient, so he will be confined

16  in solitary confinement for 24 hours a day.  Twenty-three, to

17  be exact, because he has to be permitted to exercise in some

18  form or fashion.  No windows.  Solitary.

19          THE COURT:  I understand your position.

20          MR. RAVENELL:  Before the Government responds --

21          THE COURT:  We have a courtroom full of people.  This

22  was supposed to be 15 minutes.

23          MR. RAVENELL:  One of the things that Mr. Murphy

24  touched on, and I know you have not had a chance to read the

25  documents we just provided you, one of the letters you have is

IN THE UNITED STATES DISTRICT COURT

1  a letter from Jack Johnson, and he was a Correction Specialist

2  with the Bureau of Prisons, and we have a CV --

3          THE COURT:  That's one you just gave us.

4          MR. RAVENELL:  He just retired in June, and we asked

5  him -- he is now in private practice -- to write about what

6  would happen to Mr. Needleman if he's even placed in a camp,

7  and what Mr. Murphy is alluding there is that if you're placed

8  in a camp and there is danger to his life, either perceived by

9  him or by the institution, they must place him in a special

10 housing unit, which is a SHU, twenty-three hours lock down.

11          He doesn't have any right to do anything other than

12 be in that SHU, and they must keep him there until they can

13 find another place to transfer him.

14          Now, we know about DMI.  One of the things that you

15 will see in the letter from Mr. Johnson is that DMI is also

16 affiliated with the Black Guerrilla family.  The Black

17 Guerrilla family is one of the most notorious prison groups or

18 gangs there is inside the prison.  They are the most disruptive

19 group and that is because they have shown the tendency to

20 disrupt and cause problems.

21          We know the Morales connection with DMI.  We know the

22 DMI's connection to the Black Guerrilla family.  It heightens

23 and highlights the danger that Mr. Needleman faces, and he is

24 aware of these things, and he's still willing to go forward and

25 to continue to cooperate after today, Judge.

IN THE UNITED STATES DISTRICT COURT

1          Now, we understand that he could get a subpoena and

2     be required to come in.  He could come in and be difficult.  He

3     has no intention of doing that.  He wants to do the right

4     thing, and to suggest that all of what we have just told you,

5     two levels is what is appropriate, Judge, is just so wrong.

6     The eight levels we are asking for in addition is appropriate.

7          MS. WILKINSON:  Your Honor, very briefly, the way

8     that Mr. Murphy and Mr. Ravenell speak to Your Honor suggests

9     that we could never have any cooperator who comes forward

10    against violent gangs and drug organizations would never have

11    to go to jail because we couldn't protect them in the federal

12    system.  That is ridiculous.

13         We have had many, many people come and testify who

14    are going to do a much longer stint in prison, with much more

15    public cooperation than Mr. Needleman, wear wires, got

16    admissions directly from DMI members, not what we have here,

17    who have been protected in our federal system, number one, and

18    that is an important part to know.

19         We obviously take very serious our responsibility to

20    protect our witnesses.  Mr. Needleman's public cooperation, who

21    knows if and when that will ever be.  Certainly, there are

22    options about keeping things under wraps for as long as we

23    possibly can.  He might finish his sentence before this is

24    possibly known, given the length of time even that the

25    Government is asking for.

IN THE UNITED STATES DISTRICT COURT

1          That's the most important thing to know.  We protect

2    our witnesses.  We know how to protect our witnesses.  And if

3    not, who are all these people testifying in MS-13 and every

4    other gang case that this office has done.  Obviously, people

5    who commit the crime have to go to jail.  If they cooperate

6    against these violent groups, we do what we can to protect

7    them.

8          Number two, we have to consider the fact that Mr.

9    Ravenell brought up, that it would have been known in the

10   system that Mr. Long was going to testify any way; that it

11   wasn't Mr. Needleman who provided the lynchpin, and that's

12   because eventually the State was going to have to let people

13   know.  That is true, and just like it is in the federal system,

14   and typically what happens then is we let the person know, the

15   witness know ahead of time "We're about to disclose your

16   information so, you know what, you might want to move to a

17   hotel.  You might want to go out of town for a little while."

18         We'll pay for it.  We do that all the time.  That's

19   why it is limited to discovery in which that information is

20   provided from the State's Attorney's Office and not from the

21   tenant that pays money to get referrals from Mr. Needleman in

22   his office.

23         The other important fact to know is the timing here.

24   Mr. Long went in for his first proffer on March 12th, his

25   second proffer on March 20th.  By then they have gone in,

IN THE UNITED STATES DISTRICT COURT

1   searched Mr. Morales' house.  March 21st is when Mr. Needleman

2   provided that information to Mr. Morales.  The morning of

3   March 24th he is dead.  He is shot in the head.  And what does

4   Mr. Needleman do?  He continues not only to represent Mr.

5   Morales after Mr. Morales confesses, but he continues to

6   represent Michael Quinn, who, by Mr. Needleman's own admission

7   to other people, is the head of DMI, and continues to do it up

8   through his arrest in this particular case.

9           This notion is preposterous, Your Honor, and I'd ask

10  the Court in this regard to consider the Government's

11  recommendation.  It's well thought out.  It's well reasoned.

12  We have all the information we need.  We're taking this very

13  seriously, after much deliberation, and it is the appropriate

14  recommendation in this case.

15          MR. MURPHY:  Your Honor, if I may, again briefly,

16  rebut.  Number one, the Government is not in control of the

17  secrecy of this information any longer.  The Public Defender

18  knows about it and the Public Defender's proceeding, the

19  scheduling of that is not under the Government's control.

20          Number two, the bottom line here is that this man is

21  risking his life.  Now, I don't know whether the Government has

22  lost a cooperator, but I have.  One of my clients was brutally

23  murdered because he cooperated with the Government, and so this

24  is real to me.  This is not fanciful, and in that case all

25  kinds of assurances were made that he would be protected, and

IN THE UNITED STATES DISTRICT COURT

1   this, that and the other, and "Sorry, it didn't work."

2           And the Government, if it was really being candid

3   with you, would tell you that they can't guarantee the safety

4   of its cooperators and everybody knows that.  So I think the

5   Government is assuming that the Court is naive.  I don't

6   believe this Court is naive about the dangers that Mr.

7   Needleman would face.

8           MR. RAVENELL:  I would ask the Court to look on page

9   three of our memorandum.  I know the Court has the five factors

10  the Court must consider.

11          THE COURT:  I know what they are.

12          MR. RAVENELL:  If you look at those five factors,

13  Judge, every one of them applies to Mr. Needleman, all five

14  factors apply.

15          THE COURT:  I know the five factor.  What, if

16  anything do you want me to consider in terms of the issue that

17  is before me now in this report I just got from --

18          MR. RAVENELL:  Two things.  I can summarize --

19          THE COURT:  I just got this.

20          MR. RAVENELL:  We just got it late yesterday.  I

21  would have sent it to you.  We just got it last night.  You see

22  it's dated the 14th.  Mr. Weiss worked in an institution for

23  many years, and what he tells us is this -- Let me back up.

24  Weiss is the one who worked in the institution for years.

25  First, there's what Johnson tells us, is that Mr. Needleman --

IN THE UNITED STATES DISTRICT COURT

1   let's assume that you give him a sentence of incarceration.

2   We're hoping you don't, but assume you do, and so he gets into

3   a camp and Mr. Needleman says to those in the powers that be,

4   "I'm concerned about someone.  Someone has come to me and made

5   a threat, or made a comment to me," or the jail itself, the

6   prison itself believes from what they know about Mr.

7   Needleman's case, that they think there is a potential of

8   danger.  They are going to put him in the SHU.  If there is no

9   SHU --

10          THE COURT:  I understand your position on that, but

11   why is he in greater danger under those circumstances, or

12   lesser danger as the case may be, than he is at home?  Couldn't

13   they come out there and pop him?

14          MR. MURPHY:  Because he is the former lawyer for the

15   head of that gang, and we think that conversation "How can you

16   let this go by, your former lawyer?" and, number two, Mr.

17   Needleman would have great flexibility about where he can live

18   and how he can hide.

19          MR. RAVENELL:  If he is home -- he doesn't have to be

20   home.  He is no longer barred here.

21          THE COURT:  He is going to have to disappear, and

22   according to what you assert here --

23          MR. RAVENELL:  He certainly can relocate.

24          THE COURT:  Go to Arkansas.  What you're saying is he

25   ought to disappear, change his name, get in the Witness

IN THE UNITED STATES DISTRICT COURT

1   Protection Program.

2          MR. RAVENELL:  I don't think the Government –– we

3   have not sought witness protection.  I will say this to you, he

4   certainly is considering moving from Maryland.

5          THE COURT:  All right.

6          MR. RAVENELL:  So that is clearly –– let me make it

7   very clear, that is his plan as of now is that he wants to

8   relocate from Maryland.

9          MS. WILKINSON:  Your Honor, I should correct one

10  thing.  There is no way that Mr. Needleman will be called as a

11  witness in the DMI trial, number one.

12         MR. MURPHY:  I didn't say that, nor did I suggest

13  that.

14         MR. RAVENELL:  Not DMI.  We are talking about any

15  trial, any case that you bring and any case in the state court.

16         MS. WILKINSON:  He didn't mean that.  That's fine.

17         THE COURT:  All right.  I agreed, although

18  reluctantly, to conduct this portion of the sentencing

19  proceedings in chambers because of the concerns raised by the

20  parties as to the risk to the defendant relating to his

21  cooperation.

22         The Government and the defendant entered into a

23  sealed supplement to the plea agreement that provides for

24  substantial assistance and the parties are well familiar with

25  the provisions of it.

IN THE UNITED STATES DISTRICT COURT

1          The bottom line is that the Government made a

2   commitment that if it concluded in its infinite wisdom that the

3   defendant had been of substantial assistance, they would make a

4   motion and if they don't make the motion, there is nothing the

5   defendant can do about it.  They have made that motion and they

6   have made a motion and requested that the Court depart downward

7   by two levels.

8          And their agreement did not obligate them to make any

9   recommendation higher than that.  That number of levels is also

10  consistent with the policies of the United States Attorney for

11  the District of Maryland for two levels for internal case

12  cooperation and two levels for external.  I assume in this case

13  it's probably two levels for external cooperation.

14         It is a policy that's not embedded in the guidelines.

15  It is part of the office practices and policies of this United

16  States Attorney's Office, and the Court is not obligated to

17  follow.

18         What I am obligated to follow in terms of assessing a

19  departure motion under 5K1.1 is the five factors that are set

20  forth in that section, and I am required to evaluate the

21  significance and usefulness of his cooperation, taking into

22  account and taking into consideration the Government's

23  evaluation of the significant threats.

24         There is some significance to them, although in this

25  case primarily of a corroborative nature, corroborative of what

IN THE UNITED STATES DISTRICT COURT

1    Mr. Needleman has told people, so it's not as if it solved

2    another crime.

3              It corroborated a statement made by somebody in

4    custody that, if believed and corroborated by Mr. Needleman,

5    could result in other people being prosecuted for the murder of

6    Mr. Long, as well as exculpating the person convicted of the

7    murder of Mr. Long.

8              So, it is of assistance to the Government.  It is not

9    as dramatic as it would be if the Government never knew about

10   Mr. Long having been killed by somebody hired by Mr. Morales.

11   If they didn't know it at all, it would have been of far

12   greater assistance if that were divulged to the Government, as

13   opposed to being in a corroborative role.

14             I'm require to consider the truthfulness,

15   completeness, reliability of any information, testimony,

16   provided by the defendant.  There is no question I think in

17   this case that he has been truthful and complete.  The

18   reliability will be something that could be challenged, as with

19   any cooperator, as to what he testifies, but nothing indicates

20   that what he has told them is not completely truthful and

21   reliable, because it corroborated what they have already been

22   told by the guy who hired persons to murder Mr. Long.

23             The nature and extent of his assistance is of more

24   recent or beginning.  As I said, it did not not solve the

25   crime; it corroborated what Mr. Morales said.

IN THE UNITED STATES DISTRICT COURT

1        I'll go to the last factor, the timeliness.  It

2   occurred in connection with this prosecution in this case.  He

3   did not come forward at the time he learned that there was

4   going to be a possible -- learned of the hiring of DMI came

5   late, so that it -- had he provided the information earlier to

6   the State's Attorney for Baltimore City or the United States

7   Attorney's Office, perhaps the person would be alive, or

8   prosecuted much earlier.

9        MR. RAVENELL:  No suggestion Mr. Needleman knew about

10  it.  He learned about it after the warrant.

11       THE COURT:  I understand.  After --

12       MR. RAVENELL:  I don't know how it could have kept

13  him alive.

14       THE COURT:  Substantial gap between knowing about it

15  after and the defense today.

16       MR. RAVENELL:  You said maybe the person would still

17  be alive.

18       THE COURT:  I didn't mean it in that sense.  What I

19  meant is that his knowledge that the murder had occurred was

20  not imparted to prosecutorial authorities promptly.

21       MR. RAVENELL:  Judge, he had ethical obligations not

22  to, Judge.  That's so clear.  A client tells you that he has

23  committed a crime, he cannot go forward and say.  If it's a

24  future crime, if the guy says --

25       THE COURT:  Future crime, there is no question to

IN THE UNITED STATES DISTRICT COURT

1  disclose whether --

2          MR. RAVENELL:  But to say "I have committed a

3  crime --

4          THE COURT:  Let me finish.  I recognize that his

5  assistance was fairly timely.  Now, the factor that has been

6  brought to my attention by the defense is the danger or risk of

7  injury to the defendant or his family resulting from his

8  cooperation.

9          It is clear that he has provided corroborative

10  assistance, information already in the hands of the Government,

11  that at some point could result in him being at risk of injury

12  to himself or his family when and if that becomes known.  And I

13  don't know when it would become known, but presumably it will

14  be at some point.

15          The defense argues that basically there is no

16  alternative other than to release him on probation because, or

17  give enough levels to bring him down to probation, because of

18  these risks.  These are risks that are incurred by all

19  cooperators, and if I were to take the argument to its logical

20  conclusion, we would not incarcerate anybody who is

21  cooperating, and I don't think that what would be a fair

22  application of the guidelines.

23          I'm well aware of all the steps that this Court has

24  taken to try to shield cooperation from public view.  This

25  proceeding right now is an example of that.  But the only thing

IN THE UNITED STATES DISTRICT COURT

1    extraordinary in the nature of the risk involved is that the

2    risk is to a group whose reason for existence is killing

3    people, and that is not an insignificant factor.

4            I do not agree that eight levels are appropriate, but

5    I also don't believe that two are either, and I conclude that

6    the appropriate number of levels is four, so I'm going to

7    reduce -- I will grant the Government's motion.

8            I will reduce the offense level pursuant to the

9    Government's motion by four levels, bringing it down to 15, and

10   at the applicable guidelines range that means that the

11   sentencing range for Mr. Needleman is 18 to 24 months.

12           Now, the Government has additional matters it wishes

13   to raise with respect to the sophisticated means and I don't

14   want to hear that here.  I will hear that outside.  I'll take

15   all of this into account.

16           MS. WILKINSON:  Right now, before the 5K we were,

17   after acceptance, 21 or 19; so we are at 17 or 15, depending on

18   your decision as to the sophisticated means.

19           MR. RAVENELL:  You're arguing the same thing.

20           THE COURT:  The offense level is 19.

21           MS. WILKINSON:  Without the sophisticated means.

22           THE COURT:  Without the 5K.  That is agreed upon.

23           MS. WILKINSON:  So it 16.

24           THE COURT:  I resolve that it's four, which brings it

25   down to 15.  If you're talking about sophisticated means, that

1    it should come back up two levels, that's what we will have to

2    address in court.

3            I will take into account all the information set

4    forth here, in hearing arguments on the appropriate sentence,

5    including whether there should be a variant sentence.  I

6    will -- you can assume that I am talking into account what you

7    are telling me, when whether I determine a variant sentence is

8    appropriate, but in terms of the guidelines, that is the

9    application I will make.

10           We all discuss this when we set up this conference in

11   chambers, that I'm going to simply go on the bench and indicate

12   that I have received the Report of the Probation Officer.  I've

13   reviewed the memorandum of the parties and I have studied it

14   and after taking into account all the appropriate adjustments,

15   I conclude that the offense level is 15, criminal history

16   category of one, and then we start the sentencing proceeding,

17   and I'll indicate -- I'll ask if there are any further

18   disagreements with respect to the offense levels.  The

19   Government can be heard on substantial means enhancement and

20   then we will go into the 3553 factors.  Okay.

21           MR. RAVENELL:  Thank you, Your Honor.  Your Honor,

22   the letters that you have from Mr. Weiss and Mr. Johnson,

23   they're to be consider, obviously, in the 3553A.

24           THE COURT:  I will be signing these orders for

25   sealing that just came in.

IN THE UNITED STATES DISTRICT COURT

1           MR. MURPHY:  Thank you, very much, for hearing us

2   out.  I know this was longer than you had budgeted.  Thank you.

3           THE COURT:  That's right.  It's the people out there

4   that are unhappy.  You have to go all the way around to the

5   public corridor, so they didn't think it was a problem here.

6

7

8

9                   COURT REPORTER'S CERTIFICATE

10

11                            —oOo—

12          I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above matter.

14

15   Date:

16                              /s/_____

17                              Sharon O'Neill

18

19

20

21

22

23

24

25

                    IN THE UNITED STATES DISTRICT COURT